UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALEXANDER BATISTONI and
GAIL S. BATISTONI,

      Plaintiffs,

v.                                     CASE NO. 8:09-cv-294-T-23EAJ

UNITED STATES OF AMERICA,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Alexander and Gail Batistoni sue the United States of America under the Federal

Tort Claims Act for medical malpractice that allegedly occurred at a hospital operated by

the Bay Pines Veterans Administration Health Care System (the VA) after surgery to

effect a "total knee replacement" on Mr. Batistoni.  The crucial allegation appears in

paragraph twenty-six of the complaint, which specifies the VA's alleged malpractice, on

which the Batistonis base their claims:

        (a)  Negligently inserting the endotracheal tube into the
        patient's throat prior to surgery, causing permanent damage to
        the patient;

        (b)  Negligently removing the endotracheal tube from the
        patient's throat after surgery, causing permanent damage to
        the patient;

        (c)  Negligently training its anesthesia team in the proper
        methods of induction of anesthesia to prevent mechanical
        injury to the patient's airway;

        (d) Negligently monitoring the anesthesia team to ensure that
safe methods of induction of anesthesia were being utilized to
prevent mechanical injury to the patient[.]

The non-jury trial of this action began September 20, 2010, and concluded on

September 21, 2010.  Each party submitted both a trial brief and proposed findings of

fact and conclusions of law.

**I.**

At age eighty-nine Alexander Batistoni underwent an elective, "total knee

replacement" at the VA on August 20, 2007.  Mr. Batistoni had complained of severe

knee pain, which impeded his range of activity and required his using a cane.

After conferring with Dr. John Baker, an orthopedic surgeon at the VA, during

which conference the doctor explained the nature and risks of total knee replacement

surgery, Mr. Batistoni provided informed consent for the surgery.  Mr. Batistoni

underwent extensive pre-operative testing and conferred with a VA anesthesiologist, Dr.

Selim Elzayat.  Assessed as a good candidate for general anesthesia, Mr. Batistoni

provided informed consent for general anesthesia.

Mr. Batistoni's history included prostate cancer, hyperlipidemia, gastro-

esophageal reflux disease ("GERD"), chronic obstructive pulmonary disease ("COPD"),

splenectomy, and arthritis.  Mr. Batistoni's medications included an inhaler, Citalopram

(Celexa, an anti-depressant to manage irritability and fatigue), and medication to control

GERD.

Dr. Elzayat and Solomon Green, a certified registered nurse anesthetist, attended

Mr. Batistoni's August 20 surgery.  The nurse anesthetist successfully intubated Mr.

Batistoni with an endotracheal tube.  Mr. Batistoni remained fully oxygenated throughout surgery.  After nurse anesthetist Ellen LeFleur removed the endotracheal tube, Mr. Batistoni required no artificial airway, had normal oxygenation, and was able to breath deeply.  Mr. Batistoni's post-anesthesia recovery score was nearly perfect.  Dr. Baker explicitly stated in his operative report that Mr. Batistoni received "excellent" anesthesia. No airway trauma or associated injury appears during Mr. Batistoni's surgery.

Mr. Batistoni was alert and oriented during his post-operative recovery.  Dr. Baker's post-operative assessment confirmed that Mr. Batistoni suffered no surgical complication and that Mr. Batistoni's post-operative condition was good.  Mr. Batistoni's condition permitted transfer to "the regular floor" within two hours.  In sum, no evidence of trauma to Mr. Batistoni's throat or airway appeared during his stay in the recovery room.

Following the surgery on August 20, Mr. Batistoni experienced only mild and intermittent nausea and coughing during several attempts to eat or drink.  Specifically, the medical record at the VA indicates that he vomited his dinner meal on August 21, the first day after his surgery.  The following day, August 22, the nurse reported that he "did not eat well for dinner, became nauseated."  Later that same evening, the night nurse reported the patient "did not have an emesis, only coughed up a small amount of grayish sputum."

In the morning on August 23, Dr. Baker, finding Mr. Batistoni experiencing post-operative anemia, ordered a transfusion of two units of red blood cells.  Mr. Batistoni improved throughout the day, during which he was alert and oriented.  Again, on

August 23, the nurse reported that Mr. Batistoni "had emesis x2, undigested food, very thick in consistency."  Later that morning, another nurse reported "small amount of emesis."  During that time, Mr. Batistoni told the nursing staff on August 23, I can't eat a lot of the food they send me."  On August 23, Mr. Batistoni's diet was changed to a soft diet.  In addition, the hospital record notes for the first time that Mr. Batistoni is at risk for aspiration of food and liquid and that his swallowing is impaired.

On August 25, the nurse reports at 2:37 a.m. that Mr. Batistoni was complaining of nausea without emesis.  An hour later, at 3:30 a.m., the nurse reports that he is "constantly clearing secretions from [his] mouth with tissues.  Confusion seems to be increasing as the night progresses."  By the afternoon of August 25, the nurse reports that Mr. Batistoni has altered mentation with "Altered Swallowing/Aspiration Risk."  At 7:04 p.m. the nurse reports that Mr. Batistoni was "unable to take any PO intake without coughing episode; tried small sip of water in upright position with chin down and had same result."  The nurse noted that she would not give him oral medication that evening pending a speech pathology consult.

The next morning, on August 26, the nurse reported that Mr. Batistoni "refused his po meds, says he can't swallow the pills."  The evening nurse reported that he had "poor po intake; patient keeps stating that he cannot swallow food.  He will choke."  At 10:34 p.m. she reports "He continues to refuse any solid po foods, unsuccessful attempts with dessert as well- patient continues to identify he could not swallow."

At 4:00 a.m. on the morning of August 27, the nurse reported that Mr. Batistoni awakened suddenly due to coughing and phlegm.  A chest x-ray was ordered at

6:00 a.m., the results of which indicate that Mr. Batistoni had aspirated into his lung.  Dr. Baker diagnosed the patient with a probable aspiration pneumonia.  A speech pathologist was consulted on August 27.  Her clinical findings indicated "a significant airway compromise with all PO intake.  At this time patient is not safe for PO intake, and NPO nutrition/hydration should be implemented."  She also recommended performing a barium swallow study.

By August 28 Mr. Batistoni's condition had deteriorated to the extent that he was hallucinating and experiencing a change in mentation.  He was transferred to the surgical intensive care unit for better monitoring.

In sum, between August 20 and August 25 Mr. Batistoni talked and ate and drank, although he intermittently choked or coughed.  The nursing staff's progress notes document Mr. Batistoni's daily oral intake of fluids and reveal that he drank adequately until August 25.  Mr. Batistoni experienced intermittent nausea and some vomiting (each a common consequence of anesthesia).  Mr. Batistoni expressed mucous and oral secretions consistent with his COPD and GERD.  Mr. Batistoni manifested no specific swallowing dysfunction and registered no complaint about his intubation or extubation or pain or injury to his throat.

Dr. Baker, who visited Mr. Batistoni daily; a physical therapist; and a nutritionist, each in progress notes, report Mr. Batistoni as alert, talking, eating, and drinking; leaving his bed to sit in his chair; participating in physical therapy; and walking with assistance.  None reports identifying a throat injury.

Beginning on August 25, Mr. Batistoni manifested confusion and reported difficulty swallowing.  The medical record reports that Mrs. Batistoni confirmed that Mr. Batistoni had experienced some swallowing difficulty for a few weeks prior to surgery and that his disorientation had increased during the past four months.  (Mrs. Batistoni unpersuasively denies these statements.)

Mr. Batistoni was transferred to the surgical intensive care unit for close monitoring on August 27.  Doctors suspected that Mr. Batistoni suffered from aspiration pneumonia resulting from inhalation of gastric or oral-pharyngeal contents.

Between August 25 and August 27, Mr. Batistoni was evaluated by an otorhinolaryngologist ("ENT"), a gastroenterologist, a speech pathologist, and Dr. Baker. Each evaluator found that Mr. Batistoni's symptoms and his chest x-ray in accord with aspiration pneumonia.  After reviewing the findings of the ENT's examination, Dr. Baker concluded that "the feeding problem is due to swelling caused by reflux."  A percutaneous endoscopic gastronomy ("PEG") tube was scheduled for insertion on September 4.  In the interim, Mr. Batistoni received nutrition through a nasogastric tube and improved.  No doctor found a throat injury or determined that Mr. Batistoni's swallowing problem resulted from the intubation and extubation, performed more than seven days earlier.

After placement of a PEG tube, Mr. Batistoni's condition permitted his transfer to the VA's long-term care unit for rehabilitation.  Again, Mr. Batistoni was alert, talking, and participating in physical therapy.  Mr. Batistoni was discharged to return home on December 12, 2007.

Throughout 2008, Mr. Batistoni lived at home and regularly pursued swallowing therapy at a private facility.  He began taking food by mouth but still relied on the PEG tube for some of his nutrition.

Starting in the fall of 2009, Mrs. Batistoni began asking doctors to remove her husband's PEG tube.  A speech pathologist concluded that Mr. Batistoni's oropharyngeal mechanism of swallowing was sufficiently safe to protect his airway, and that–with effort–Mr. Batistoni could swallow.  However, Mr. Batistoni's COPD-related breathing problems contemporaneously worsened and, consequently, he became oxygen dependent.

As of June, 2010, Mr. Batistoni had eaten (including chips, baked chicken, baked beans, and biscuits) exclusively by mouth for longer than six months.  On July 1, 2010, the PEG tube was removed.  The removal resulted in an array of additional complications.

Since July, Mr. Batistoni has required hospitalization for recurrent aspiration pneumonia.  Mr. Batistoni depends again on a PEG tube and suffers early stage dementia.  In August, 2010, Mrs. Batistoni requested that Mr. Batistoni transfer from the community hospital to the VA.

As of August, 2010, Mr. Batistoni was alert and well.  However, his condition has deteriorated recently.

## II.

The following abridgement of the nurses' progress notes offers a reliable and graphic narrative of the first seven days of Mr. Batistoni's post-operative course:

**BAT1055**
**Aug 20, 2007@15:34**

SUBJECTIVE:  "Oh I'm in pain."

OBJECTIVE:  Received from OR to PACU bed #6 on orthod bed; pt. drowsy and slow ro arouse; opens eyes and able to follow commands

. . . .

NEUROLOGICAL:  Drowsy; Orients to Person; Responds appropriately; Cooperative. Moves all extremities:with equal strength. . . .

PULMONARY:  Lungs clear to auscultation bilaterally

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1052**
**Aug 20, 2007@16:30**

SUBJECTIVE:  No verbal communication

OBJECTIVE:  SP Left TKR.  Received pt. from PACU, via bd.  Pt. lying in bed quietly, no s/sx of distress.  LLE elevated on CPM and wife at bedside.

. . . .

| RISK FACTORS | Points | Score |
| --- | --- | --- |
| Confusion/Disorientation | 4 | |

. . . .

**BAT 1053**
RESPIRATORY:  Lung sounds CTA bilat. on 02 at 2L via NC, no SOB.  Lung sounds CTA bilat.  and diminished at bases.  Instructed to turn, deep breath and cough and use of IS each hr.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1051**
**Aug 21, 2007@01:13**

SUBJECTIVE:  "It's a little sore, about a 4 or 5"

OBJECTIVE:  Patient rec'd asleep in bed, easily awakens for assessment, oriented to all spheres. . . .  Patient states pain 4/10, encouraged use of MSO4 PCA.  Reported to have had nausea on eve tour, patient states no nausea at this time. . . .  Respirations even and unlabored on o2 2l via N/C, sats 96%, lung sounds clear, no SOB, inspirex teaching with patient. . . .

08/21/2007  ADDENDUM:  Uneventful night, patient slept most of tour.  C/o increased pain this AM, encouraged patient to use MSO4 PCA, states he forgot about it, some relief noted after a few doses.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1044**
**Aug 21, 2007@03:30**

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1036**
**Aug 21, 2007@15:33**

SUBJECTIVE:  Informal conversation.

OBJECTIVE:  No S/S of distress at this time. . . .

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1033**
**Aug 21, 2007@16:00**

OBJECTIVE:  SP Left TKA, POD#1.  Pt. lying in bed quietly, wife at bedside.

. . . .

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | |

. . . .

**BAT1034**
RESPIRATORY:  Lung sounds CTA bilat. on O2 at 2L via NC, no SOB.  Lung sounds CTA bilat. and diminished at bases.  Encouraged pt. to turn, deep breath and cough.  Pt. uses IS each hr.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1024**
**Aug 22, 2007@02:42**

SUBJECTIVE:  "I'm getting sick."

OBJECTIVE:  Patient on call light stating the above.  Did not have an emesis, only coughed up a small amount of greyish sputum.  SOD called by RN and nausea medication was ordered.  Patient made aware of nausea medication order, but states he felt better after coughing up the mucus. . . .

. . . .

RESPIRATORY:  Lungs are CTA, RR even/unlabored.  Denies shortness of breath.  O2 at 2L per nc.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1021**
**Aug 22, 2007@05:13**

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1015**
**Aug 22, 2007@16:18**

SUBJECTIVE:  "My pain level is a 7"

. . . .

**BAT1017**

08/22/2007  ADDENDUM:  1030  Pt was up in wheelchair and sent to PT for the first time.  Tolerated activity well now that he understands how to work PCA pump properly.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1011**
**Aug 22, 2007@19:17**

SUBJECTIVE:  "I'm just a little uncomfortable."

OBJECTIVE:  Pt. awake, side rails up x 2, call [l]ight in reach. . . .

- 10 -

NEUROLOGICAL:  Alert.  Oriented to:  Person, place, time and event.

. . . .

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | 0 |

. . . .

**BAT1014**

08/22/2007  ADDENDUM:  Pt awake, reading newspaper.  CPM continues to run form 0-60 degrees without difficulty.  Will continue to monitor pt. closely.

08/22/2007  ADDENDUM:  Pt. easily a[r]oused, call light in reach.  CPM taken off at this time.  Pt. had 200 mL of amber-colored urine returned this tour.  Bladder scanned with 397mL of urine detected.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1003A**
**Aug 23, 2007@03:18**

SUBJECTIVE:  "I need the bedpan."

OBJECTIVE:  Patient placed on the bedpan, had a very large liquid foul smelling stool.  POD#3 from a (L) TKA.  Ace wrap dressing to the (L) leg is intact.  Pedal pulses are palpable.  Refusing ice packs tonight.  Lungs are CTA, diminished breath sounds.  Bowel sounds are positive, large loose BM x2 so far this shift.  EUD to foley bag, dark amber output.  IVF's and Morphine PCA as ordered.  O2 at 2L per nc.  VSS, afebrile.  *Had emesis x2, undigested food, very thick in consistency.  Given compazine 10 mg IVP at 00:53.  Nausea medication effective.  Patient is resting at this time with eyes closed, RR even/unlabored.

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1003**
**Aug 23, 2007@08:53**

PLAN:  Transfuse 2 units RBC today

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1001**
**Aug 23, 2007@10:00**

Pt alert and oriented to person, place, and time.  Pt difficult to communicate with as he was not feeling well.  He was having difficulty answering questions asked by this worker due to pain.

- 11 -

. . . .

Unable to get answer from pt as to rehab option he would consider.  Will follow-up with pt when he is able to communicate better.

. . . .

Provided wife with contact information for Medicare.  Placed LTC consult.  Received call from MD Tamayo.  He reports pt wants to discuss CLC with wife before making his decision.  MD reports he will rescreen later today if he is able to speak with wife.  If unable to speak with wife will rescreen Monday (8/27).  Will follow-up with pt and wife.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT1000**
**Aug 23, 2007@10:58**

ALERT AND ORIENT VET LYING IN BED RESTING WITH EYES CLOSED. DENIES PAIN AND DISCOMFORT AT THIS TIME. ACE BANDAGE TO LEFT TOTAL KNEE. . . . SMALL AMOUNT OF EMESIS NOTED.  VET DENIES BEING NAUSEATED.+  . . . POOR APPETITE.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0998**
**Aug 23, 2007@13:35**

. . . .

- Per interview w pt:  Pt stated, "My appetite's not too good.  I can't eat a lot of the food they send me" . . . .

NUTRITION INTERVENTION:  Change diet to mechanical soft; pt agreeable to this.  Pt stated that he uses a lower partial when he eats and that food sometimes gets stuck in it. I inquired as to what would help him with this prob and he stated a toothbrush would help him.  He did not want to see a dentist and did not want denture cream.  Order written for nursing to assist w this.  Diet adjusted for food preferences:  coffee and creamer packets; ice cream snacks, milk (pt does not tol ensure plus and refused these).

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0991**
**Aug 23, 2007@16:04**

SUBJECTIVE:  Can you find my hearing aids?  Then can you find my teeth?

OBJECTIVE:  Pt drowsy this am, but is responsive to verbal stimuli.  HOB elevated approximately 30 degrees.  LL extremity elevated on CPM machine.

NEUROLOGICAL:  Alert/ oriented x4 when awake.

. . . .

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0986**
**Aug 23, 2007@18:38**

SUBJECTIVE:  Hello there, this thing is not working, I have to squeeze it, to make it work. I had several liquid stool this am.

OBJECTIVE:  Sitting in his bed, watching TV, resting quietly, patient wife at the bedside. Noted no distress.  IVF to 20 ml / hr while units of lrbc are infusing.

. . . .

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | |

. . . .

**BAT0989**
08/23/2007  ADDENDUM: AOX3.FIRST UNIT OF LRBC IS DONE INFUSING.  PATIENT DENIES HAVING PAIN.  NOTED NO DISTRESS.  PATIENT IS SATTING 96% ON 2 LITERS OF O2

08/23/2007  ADDENDUM:  aox3.second unit of lrbc is currently infusing, estimated 150 ml remaining in the bag to be infused.  patient denies having pain.  noted no distress.  patient is spitting white mucous since the beginning of the shift.  patient is satting 96% on 2 liters of O2.  Noted no sob.SOD IS AWARE.

**BAT0990**
08/23/2007  ADDENDUM:  Aox3.second unit of Lrbc is done infusing.  patient denies having pain.  noted no distress.  patient is satting 95% on 2 liters of O2.  Patient refused his LLE cpm, patient states "Put it in 5 hours, they kept it all day the first time.".  LLE Is elevated with one pillow.  patient able to moved his toes to his ble.  Noted no sob.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0977**
**Aug 24, 2007@02:51**

SUBJECTIVE:  "As long as you don't move my leg, I'm fine."

OBJECTIVE:  . . . .  IVF's of .45ns infusing at 75cc's/hr, Morphine PCA delivering 1mg q6min on patient demand, has not used any pain medication since 9pm.  Lungs are CTA, RR even/unlabored. . . .

. . . .

**BAT0979**
08/24/2007  ADDENDUM:  Patient agreed to let this writer place his leg in the CPM.  CPM is set at 0-60.  Patient is alert and oriented to person, place.  Somewhat confused to situation.  Reorients fairly well.  IVF tubing changed this shift.  EUD with adequate urine output.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**BAT0968**
**Aug 24, 2007@12:25**

. . . .

**BAT0972**
COPD with chronic interstitial changes.  No acute process.  If symptoms persist CT of the chest is recommended. . . .

There is hyperinflation the lung fields consistent COPD.  There are interstitial changes noted lungs bilaterally.  The chronic in nature.  There is discoid atelectasis noted in the right lung base.  There is no evidence of acute infiltrate, effusion or pneumothorax.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**BAT0964**
**Aug 24, 2007@14:07**

Rescreen done this afternoon.  Spoke to patient and his wife regarding placement to CLC for rehab.  Patient agreed on receiving rehab at CLC.  Tentative accepted to CLC-E for Monday, 8/27/07, if medically stable.  Please prepare discharge summary and GEC referral form.  Please arrange for transportation to CLC-E by 10 AM.  Charge nurse in 3C made aware.  Admission Specialty Code:  short stay, rehab, 64.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**BAT0960**
**Aug 24, 2007@14:14**

SUBJECTIVE:  "I'm okay"

. . . .

RESPIRATORY: Lungs clear to ausculation.  Respiration even and regular.  Coughs at times.  Productive with clear sputum coming from throat. . . .

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**BAT0952**
**Aug 24, 2007@17:49**

SUBJECTIVE:  Hi there Herman, I'm still spitting white mucous.  You can put that condom if you want, so I won't wet the bed.  I don't need oxygen right now.  I had a small bm this am.  I am not that hungry!  I'm going home tomorrow night, and I'll be going to church Sunday am.

OBJECTIVE:  Laying in his bed, watching TV, resting quietly, noted no distress.

. . . .

**BAT0953**
NUTRITION:  Tolerates po very well, assist on all meals with aspiration

. . . .

ACTIVITY- Degrees of physical activity.
    3.  Walks Occasionally

. . . .

**BAT0955**
08/24/2007  ADDENDUM:  Patient call for a nurse, by using his nurse call button.  Patient states "I need to be cleaned up, I pooped all over me".  Check for bm, patient is cleaned, noted no bm.  Patient appears forgetful, patient refused his LLE cpm and LLE pillow.  Patient states "Do they have a nurse in the house, throw this away, I got a new one".

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0944**
**Aug 25, 2007@02:04**

SUBJECTIVE:  "I'm going home."

OBJECTIVE:  Patient on side of bed, trying to stand up.  "My wife is coming to pick me up."  Patient is confused to place and time.  Alert to person.  Urinary drainage bag, linens, and SCD tubing all tangled up together.  Incontinent of large amount of greyish colored, fouls-smelling soft stool. . . .  Lungs are CTA, diminished breath sounds noted.  Denies shortness of breath  O2 sat 92% on room air.  Has a productive cough, oral secretions are clear white in color. . . .

INTERVENTIONS:  Keep patient on ESO throughout the night due to confusion and for fall risk.  Report problems to RN.

. . . .

08/25/2007  ADDENDUM:  No more complaints of nausea, constantly cleaning secretions from mouth with tissues.  Confusion seems to be increasing as the night progresses.  Thinks the trapeze bar is a shower head, continually saying "I'm getting wet, I'm getting wet."  Also wanting staff to call a cab to take him home.  Reorients for brief periods only.  Will continue ESO for safety.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0941**
**Aug 25, 2007@07:16**

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

- 15 -

**BAT0940**
**Aug 25, 2007@10:37**

. . . .

08/25/2007  ADDENDUM:  Patient recovered from ill stomach and came at 11am for therapy.  Patient performed well ambulation in parallel bars 60 feet.  Then returned to unit for toileting.  Time spent 15 mins

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0937**
**Aug 25, 2007@15:21**

SUBJECTIVE:  "I feel ok today".

NEUROLOGICAL:  Alert

ORIENTED TO:  Person, place, and situation.

DISORIENTED TO:  Time and having visual hallucinations stating; "Look at those dogs running around on the floor over there".

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0935**
**Aug 25, 2007@15:47**

ASSESSMENT:  Altered comfort.  Altered mobility.  Altered mentation.  Altered Swallowing/Aspiration risk.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0929**
**Aug 25, 2007@17:26**

SUBJECTIVE:  "who are you?"

. . . .

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | |

. . . .

**BAT0930**
RESPIRATORY:  coarse lung sounds to auscultation bilaterally

. . . .

- 16 -

**BAT0933**
082/5/2007 ADDENDUM:  2100 PT UNABLE TO TAKE ANY PO INTAKE WITH OUT
COUGHING EPISODE; TRIED SMALL SIP OF WATER IN UPRIGHT POSITION W/
CHIN DOWN AND HAD SAME RESULT. PT HAS ANCHOR AT HIS SIDE AND
SUCTIONS PRN. WILL HOLD PO MED THIS PM . . . .

08/26/2007  ADDENDUM:  . . . pt is actually extremely confused with auditory and visual
hallucinations.  pt was examining anchor stating that he saw screws rattling around in it.
examined anchor and attempted reorientation.  pt failed to be reoriented.  remains alert
and extremely confused.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0920**
**Aug 26, 2007@02:04**

SUBJECTIVE:  "Give me my chocolate."

OBJECTIVE:  On initial rounds pt requesting his chocolate which he seems to think was
the trapeze.  Reoriented without success.  Repetitive behavior.  Bilat hearing aids.
Patient able to identify the year, president, hospital and his name but unable to explain
why he's here.  Pleasntly confused.  ESO continues for safety and confusion. . . .

NEUROLOGICAL:  Alert

ORIENTED TO:  x3 pleasantly confused this tour.

. . . .

**BAT0922**
08/26/2007  ADDENDUM:  0500- Resting at intervals this tour in NAD.  Holding on to
trapeze most of tour.  Left leg elevated on pillow.  Dressing remains clean dry and intact.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0918**
**Aug 26, 2007@08:48**

SUBJECTIVE:  "I don't have any pain right now".

NEUROLOGICAL:  Alert

ORIENTED TO:  Person, place and situation

DISORIENTED TO:  Time and having visual hallucinations; talking to people who are not
there.

. . . .

**BAT0919**
08/26/2007  ADDENDUM:  Patient goten up in cardiac chair with minimal assist and
ambulates well, continues to be confused and appears to be having an increase with
hallucinations.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0914**
**Aug 26, 2007@12:00**

ASSESSMENT:  Altered mentation.  Infection.  Altered comfort.  Aspiration risk/Swallowing impaired.  Physical mobility.  Nutrition.

. . . .

**BAT0916**
HISTORY:  Not eating

EXAM:  Confused

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0910**
**Aug 26, 2007@19:05**

SUBJECTIVE:  I told them at the stadium, they need to get people here- give them what they want and you'll make money.  I showed you how to clean that fish- watch again.

OBJECTIVE:  Pt sitting upright in bed with wife at bedside.  He is disoriented to person, place and time.  Attempts to reoriented pt are unsuccessful.  He does have short periods of lucidness when talking with wife.  Wife identified that this type of disorientation has been increasing during past 4 months.

ACTIVITY/ADL/ SAFETY:  Is total care patient for his physical needs at this time.  He is not combative, and is compliant with most redirection when you are able to get his attention.  Thought process becommes focused on a subject, then he will discus the subject with appropriate interactions verbally.  He is able at times to assist with repositioning in bed.  He does need pillows about him to keep him from sliding into the upper side rails.

| RISK FACTORS | Points | Score |
|---|---|---|
| Confusion/Disorientation | 4 | 4 |

. . . .

RESPIRATORY:  bilaterally lung sounds congested, with course rhonchi- clears with aggressive pulmonary toileting response by pt.  Pt utilizes yankeur suction to

**BAT0911**
remove sputum. . . .

NUTRITION:  poor po intake-  Pt keeps stating that he cannot swallow food-  he will choke.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

**BAT0909**
**Aug 26, 2007@22:42**

OBJECTIVE:  Pt has intermittently continued with auditory and visual hallucinations.  He is able to carry on conversations, pointing out immaginary dogs, picking items in the air.  Again he is not combative, and is cooperative.  O2@ 21pn.  IVF patent @ 75cc/h for hydration.  He continues to refuse any solid po foods, unsuccessful attempts with desserts as well- pt continued to identify he could not swallow.  FSG @ 2100-125.  Multiple failed attempts at oral hygiene as well.  Repositioned and skin care given.  Currently resting on his left side with pillows utilized to maintain this position.  CPM utilized for approximately 1 hour total- pt becomes more restless/ anxious when utilized.  Elevated side rails x2.  Call light in reach at bedside.

. . . .

### III.

The Batistonis offered in support of the claim of medical negligence the expert testimony of Joseph Stirt, an anesthesiologist with impressive experience as a practitioner and as an academic.  Dr. Stirt (1) established that typically either or both of the anesthesiologist and the nurse anesthetist intubate a surgical patient and (2) presented and described both the insertion and the operation of a laryngealscope and an endotracheal tube and illustrated each with the plaintiffs' Exhibits 15 and 15A. Dr. Stirt established that the anesthesiologist and the nurse anesthetist might "confirm endotracheal intubation, which is critical," (1) by the "most important" method, "visual verification," (2) by consulting a carbon dioxide monitor that is attached to the anesthesia machine and that measures exhaled carbon dioxide (a rise in carbon dioxide evidences "proper placement"), (3) by placing a stethoscope at each side of the chest and listening for "definitive sounds" of air movement as the breathing bag is squeezed, (4) by placing a stethoscope at the stomach and confirming the absence of air moving in the stomach as the breathing bag inflates and deflates, and (5) by "feel[ing]" the throat for a characteristic bounce as you gently palpate the front of the trachea if the tube is correctly placed . . . ."  However, Dr. Stirt provided no evidence that any of these five

- 19 -

methods of confirmation revealed a negligent, erroneous, or injurious placement of the laryngealscope and endotracheal tube in Mr. Batistoni's case.

Dr. Stirt identified a range of risk from intubation, including a risk of injury to "the teeth, the tongue, the epiglottis, the palate, the pharynx, the back of the throat, the larynx and vocal cords, and the esophagus," and Dr. Stirt characterized an injury from intubation as "not common, but . . . not unheard of . . ."  Dr. Stirt testified (1) that from a negligently inserted laryngealscope or endotracheal tube a patient can possibly incur injury resulting in aspiration if the "swallowing derangement is profound enough" (although Dr. Stirt nowhere establishes a "profound derangement" to Mr. Batistoni by the intubation and nowhere provides any quantitative, qualitative, or other measure of the requisite profundity) and (2) that complications can include hypoxemia, soft tissue damage to the pharynx and esophagus, and – according to a leading treatise – injury to some surrounding nerves.  Dr. Stirt noted "severe upper pharyngeal dysphagia" diagnosed in Mr. Batistoni's VA record several days after the surgery to effect his total knee replacement.

Although he notes that the nurse anesthetist at the VA intubated Mr. Batistoni and that the VA's record uniformly describes the intubation as "successful" and otherwise unremarkable, Dr. Stirt opines that an injury occurred during intubation and that the nurse anesthetist either failed to perceive, or perceived but failed to report, the injurious incident.  Dr. Stirt supports his opinion by quoting from the report (Bates 0862) of a physician's assistant, David Cherryholmes, after an examination of Mr. Batistoni. The report states:

> [T]he Olympus fiberoptic nasophyrangescope was passed through the nasopharynx to the level of the glotis without difficulty.  Patient tolerated the procedure well.
>
> Eryt[h]ema in the supraglottic larynx was noted.  The vocal cords are covered with benign mucosa. Movement on both sides is normal.  No lesions seen in the oral cavity, pharynx, or hypopharynx.
>
> This picture is consistent with GERD and possibly intubation injury.

(Also, Dr. Stirt mentions the report of Dr. Hollingsworth, a speech pathologist, whose report erroneously states Cherryholmes's finding as "some irritation/edema, likely secondary to intubation," which is not at all what Cherryholmes said.)  Dr. Stirt discusses and finds revealing that Mr. Batistoni's pre-operative x-rays show no evidence of aspiration but post-operative x-rays show "densities and markings which were absent pre-operatively and those were diagnosed by the radiologist as possibly being evidence of pathology, new pathology."

Dr. Stirt stated his opinion on a central issue in this medical negligence action:

Q:   Now, Doctor, based upon everything you reviewed as far as the medical records, the VA hospital records, as well as your background and training, your education and 30 years of experience as an anesthesiologist, did you form an opinion as to the likely cause of Mr. Batistoni's upper pharyngeal dysphagia?

A:   I did.

Q:   And what was that – what is that opinion, Doctor?

A:   My opinion is that Mr. Batistoni's upper pharynx was damaged at intubation on August 20, 2007 and that his subsequent swallowing difficulties resulted from that injury.

Q:      What objective signs are you relying upon for your opinion that he
        suffered an intubation injury that was not reported by the nurse
        anaesthetist?

A:      Well, the medical history starting the first day after surgery, the 21st
        of August of 2007, on a pretty much daily basis has entries relating
        to Mr. Batistoni's problems with swallowing; specifically, on the 21st
        there is a nurse's note stating that he had an episode of emesis or
        vomiting.

        There is a note on the 23rd that said he had another such episode.
        And, in fact on the 23rd on the third post operative day there was a
        note in the nursing records by the nurse taking care of Mr. Batistoni
        that there was a danger of aspiration; that there were enough
        problems with his swallowing mechanism that aspiration needed to
        be looked out for basically such that he didn't have that happen.

        Continuing on the 24th, these aspirations precautions are noted in
        the chart.  On the 25th, he is markedly – became markedly worse in
        respect to his swallowing problems, coughing and choking upon
        trying to eat.  At that point, a serious investigation with several
        services involved was mounted to try to find the reason for his
        inability to swallow properly.

Q:      Doctor, do you believe that there is any other reasonable
        explanation for the abnormal findings that were noted by Mr.
        Cherryholmes and also by Dr. Hollingsworth involving Mr.
        Batistoni's throat?

        . . . .

A:      I do not believe there is any other reasonable explanation.

        Dr. Stirt admits that Dr. Baker observed Mr. Batistoni in the surgical recovery

room and reported him as "doing well," that the nursing record from the recovery room

reports Mr. Batistoni as "doing well" and "not complaining of pain," and that Mr. Batistoni

was released to the regular floor within two hours.  Although noting that Mr. Batistoni

experienced nausea and vomiting episodically within the first five days after surgery,

Dr. Stirt concedes that nausea is a "well know side effect of anesthesia" and that a risk

- 22 -

of aspiration, diagnosed on August 23, three days after surgery, accompanies Mr.

Batistoni's COPD and his GERD, each of which is a sufficient cause.  Dr. Stirt admits

that, although nausea and vomiting occurred within five days after Mr. Batistoni's

surgery, no progress note or the like contains a report of Mr. Batistoni's inability to

swallow or even Mr. Batistoni's difficulty in swallowing.  Dr. Stirt infers the presence of a

"swallowing difficulty" from the presence of vomiting.  Dr. Stirt admits that Mr. Batistoni

was talking during the five days following surgery.

> Q:  And on the 25th of August, five days post-operatively was the first
> time he began choking and coughing upon trying to take liquids by
> mouth, is that right?
>
> A:  Yes.

Dr. Stirt also acknowledges that Mr. Batistoni was eating during the five days

after his surgery and that Mr. Batistoni complained about food lodging in the lower plate

of his dentures:

> Q:  Nutrition Assessment.  If you look at the bottom of that page, Dr.
> Stirt, there is a conversation there between Mr. Batistoni and the
> nutritionist where he complains that he's getting food stuck in his
> lower partial plate and then he requests some other kinds of food to
> suit his preferences, do you see that?
>
> A:  I do.
>
> Q:  So if Mr. Batistoni was unable to eat would you expect to see that
> noted in there?
>
> A:  No.
>
> Q:  Okay.  So, if Mr. Batistoni is telling the dietician that he's getting
> some food stuck in his lower plate he would like a softer food and
> he would like some ice cream, he's eating at that point, isn't he, Dr.
> Stirt?

A.      Yes.

Q:      The nursing notes show that he's taking fluids by mouth, right, intake and output for those five days?

A:      Yes, most of them.

Dr. Stirt concedes that no lesions were observed in Mr. Batistoni's throat, that GERD or vomiting could cause any "redness and swelling" observed in Mr. Batistoni's throat during the five days after his surgery, and that the bi-lateral movement identified by Mr. Cherryholmes in Mr. Batistoni's throat is normal.

Dr. Stirt concedes that "oropharyngeal dysphagia sometimes arises after a stroke" and that Mr. Batistoni became confused and began hallucinating about August 25 or 26, five or six days after his surgery, both of which symptoms "could be the product of a neurological event," which Dr. Stirt cannot exclude in this instance.

In sum, Dr. Stirt attributes to nurse anesthetist Green (or Dr. Elzayat, the anesthesiologist) the supposed deviation from the standard of care on which Dr. Stirt relies in his opinion that Mr. Batistoni was the victim of medical malpractice.  Dr. Stirt states explicitly that "the placement of the endotracheal tube during laryngoscopy" failed to meet the standard of care, but Dr. Stirt neither (1) identifies the precise act or omission that occurred or failed to occur and that caused Mr. Batistoni's condition nor (2) identifies the mechanism by which the putative negligence caused the observed injury, although Dr. Stirt concedes that "by all objective evidence there is no deviation in any of the steps in that anesthesia" and that he cannot "rule out" other possible causes, such as GERD or stroke, that are not attributable to nurse anesthetist Green or any other health care provider at VA.

- 24 -

**IV.**

In response to Dr. Stirt, the United States summoned two physicians to provide

an opinion on the central question of medical malpractice.  First, the United States

called Harold S. Minkowitz, a "board certified" anesthesiologist with impressive

accomplishment in both academic medicine and the practice of medicine and with

impressive qualifications to opine on anesthesiology, including intubation, extubation,

airway management, patient care, and the like.  Dr. Minkowitz's review of Mr. Batistoni's

medical records leads him to opine that Mr. Batistoni's "anesthesia care was uneventful

and had no relationship to the subsequent dysphagia."  Dr. Minkowitz discussed and

illustrated the proper technique for intubation and for monitoring the success of the

intubation.

Although he admits the possibility of an anesthesiologist's or a nurse

anesthetist's inserting the tube mistakenly into the esophagus, Dr. Minkowitz confirms

Dr. Stirt's testimony that this error is easily identified by several available methods.  Dr.

Minkowitz also opines that, because Mr. Batistoni is five-feet-four in height and weighs

about 125 pounds, intubation is likely easier than with a rotund subject.  Dr. Minkowitz

found the pre-operative assessment both thorough and in accord with the standard of

care.  Dr. Minkowitz specifically identified the recordings of Mr. Batistoni's oxygen levels

throughout the surgery and noted that "the oxygenation was adequate throughout the

case."  Dr. Minkowitz explained that the constantly satisfactory oxygenation confirms the

adequacy of the intubation, that is, "that the intubation was successful" and "that there

was . . . no time that Mr. Batistoni was subjected to inadequate oxygenation."  Dr.

Minkowitz explained further that if a nurse anesthetist struggled with the intubation, "someone like [Mr. Batistoni] would de-saturate or his oxygen level would drop very rapidly had there been a problem . . . [but] according to the record, there was no problem."

Dr. Minkowitz examined the record of the extubation and the recovery room record and found no evidence of a problem in extubation and no post-operative indication in the record of any operative trauma.  Dr. Minkowitz notes that the medical record includes the surgeon's observation of "excellent general anesthesia" and that the medical record contains no "evidence . . . that Mr. Batistoni suffered an acute injury to his throat following the surgery on August 20."  Dr. Minkowitz notes that Mr. Batistoni immediately after the surgery registered no complaint that appears in the record about any throat injury or discomfort and no complaint about choking or swallowing, although Mr. Batistoni registered a complaint about nausea, which Dr. Minkowitz finds "pretty common."  Dr. Minkowitz attributes Mr. Batistoni's immediate post-operative "coughing up" of some sputum to Mr. Batistoni's COPD.

Dr. Minkowitz commented tellingly on physician's assistant Cherryholmes's August 28 report, which states (unedited) (BAT2428):

> Pt. Seen @ bedside by Dr. Merchant.  He was appropriate on time and place, and knows who the president is.  Not complaining at this time.
>
> The Olympus P3 fiberoptic nasopharyngoscope was passed through the nasopharynx to the level of the glottis without difficulty.  Patient tolerated the procedure well.
>
> Erytema in the supraglottic larynx was noted.  The vocal cords are covere with benign mucosa.  Movement on both sides is normal.  No lesions seen in the oral cavity, pharynx, or hypopharynx.

This picture is consistent with GERD and possibly intubation injury.

Pt. needs coverage to suppress acid reflux.

Dr. Minkowitz explains that the bi-lateral movement of the vocal cords and the absence of lesions noted by Cherryholmes confirms the absence of nerve injury and traumatic injury in the oral cavity, pharynx, or hypopharynx.

In response to questions from the plaintiff's counsel and the court, as well as defense counsel, Dr. Minkowitz expressed disbelief that during intubation an injury, particularly a direct and forceful trauma, will occur with sufficient force to injure the surrounding nerves and impair the patient's swallowing.  Dr. Minkowitz opined that an injury of requisite force and consequent severity, if possible, would result in immediate, post-operative pain, which is entirely absent from the record in Mr. Batistoni's instance. Dr. Minkowitz noted that, although the endotracheal tube passes near the epiglottis during intubation and although contact with the epiglottis is "pretty common," he had "never seen or heard of" a patient's incurring "damage to the extent that it would compromise the ability to close that airway so that someone would have an aspiration problem . . . ."  Dr. Minkowitz attributed the post-operative swallowing and other problems encountered by Mr. Batistoni to "a generalized neuromuscular weakening of the swallowing and esophageal mechanism," aggravated by GERD, "unmasked" by the stress of surgery on a patient of Mr. Batistoni's age, and progressing "during the perioperative period."

The United States next elicited the opinion of Dr. Michael H. Weiss, a formidably qualified gastroenterologist, who began his testimony by stating that he was able to "see

no evidence by reviewing the medical record that there was any traumatic injury to the throat during the intubation."  Dr. Weiss defined "dysphagia" as "difficulty swallowing" and divided instances of dysphagia into oropharyngeal dysphagia and esophageal dysphagia.  After confirming his review of the anesthesia record from Mr. Batistoni's surgery, Dr. Weiss noted the maintenance of satisfactory oxygenation or ventilation "during the course of the three hour surgery" and noted that the record states the anesthesia was "atraumatic."  Dr. Weiss notes the absence in the record of any indication that Mr. Batistoni encountered "difficulty either with his breathing or his swallowing" within twenty-four hours after the August 20 surgery, although the record includes nausea, which Dr. Weiss confirms is not "indicative of swallowing difficulties."  Dr. Weiss commented on an August 23 "nutritional assessment" (BAT2562):

Q:   Does this record tell you anything that's relevant to your opinion that Mr. Batistoni was not injured as a result of the intubation?

A:   He doesn't describe any difficulty with the swallowing, merely has some food preferences.

Q:   Did you see anything in this record indicating that Mr. Batistoni had swallowing problems?

A:   No

Q:   And at this point what types of things were in his diet?

A:   At the point of the interview he was on a regular diet.  And after the interview, he was changed to a mechanical soft diet to help with some of his preferences.

Q:   Why did they change it?

A:   He stated that he had difficulty with some of the food getting up above his partial plate and preferred some of the softer foods.

After noting that Mr. Batistoni continued without swallowing difficulty through August 24 and remained "alert and oriented," "excited," and "hoping to go home," Dr. Weiss notes that the record confirms that Mr. Batistoni had the "usual food intake pattern and his nutrition is adequate."  (BAT0953)  Dr. Weiss next commented upon Mr. Batistoni's decline:

Q:     In this record, going back to the first page, it states that Mr. Batistoni was spitting up white mucus.  What is that indicative of?

A:     Upper airway secretions perhaps related to his chronic obstructive pulmonary disease or having some congestion or post-nasal drip.

Q:     Is it indicative of swallowing difficulties?

A:     No.

Q:     Did at some point Mr. Batistoni develop swallowing problems?

        . . . .

A:     Early in the morning of the 26th of August, he likely had an aspiration pneumonia and dropped his oxygen levels, became confused and had to be transferred to the intensive care unit with a chest x-ray finding of aspiration pneumonia.

Q:     So that was five days after the surgery?

A:     Yes, getting into the morning of the sixth day.

        . . . .

Q:     Dr. Weiss, why do people aspirate?

A:     A variety of causes, but in general, the main contributors are acid reflux so that the mechanism of protecting the airway is not as good because liquids have an easier time coming up.  Altered mental status.  Patients that are demented or on narcotics.  And, also, patients that are more in a supine or flat position rather than patients that are upright and ambulatory.

- 29 -

Dr. Weiss recalled no instance of an aspiration caused either by intubation or by a traumatic injury to the throat.  Dr. Weiss discussed Mr. Cherryholmes report, mentioned above, and confirmed Dr. Minkowitz' assessment (Dr. Weiss saw "no signs of any significant damage to the area in the back of the throat . . .") but Dr. Weiss distinctly discussed a report (BAT0689) by Dr. Angelo Fernandes of his installation of Mr. Batistoni's PEG tube, during which installation on September 4 "[t]he EVIS endoscope was passed through the cricopharyngeus into the esophagus":

Q:    Dr. Weiss, does this record from the endoscopy tell you anything that is relevant to your opinion that Mr. Batistoni was not injured as a result of an intubation?

A:    It essentially shows that the esophagus is normal.

Q:    Can you point out to the court where it shows you that?

A:    Under the details of the procedure, third sentence.  "The esophagus is normal."

Q:    Was there anything noted here that would be consistent with some sort of traumatic injury to the throat?

A:    No

Dr. Weiss notes that Dr. Fernandes's installation of the PEG tube presented an opportunity for direct observation of the areas pertinent to the question of trauma to Mr. Batistoni's throat by intubation.  Once again, no trauma is noted.  Instead, the esophagus is characterized as "normal," and Dr. Fernandes's report includes no mention of an abnormality or any other remarkable characteristic of the pharynx and adjoining areas.

Dr. Weiss opines that intubation could result in impaired swallowing only if a "prolonged" intubation, thirty-six hours at least, created "substantial pressure against the nerves in the back of the throat."  Dr. Weiss divided patients with dysphagia into those who need a feeding tube because of cancer of the upper airway or upper digestive tract and those who have swallowing difficulty "based upon neuromuscular deficits."  Dr. Weiss described the latter half as "patients who have had an obvious stroke and cannot swallow."  However, Dr. Weiss noted that many patients with a swallowing difficulty "are just older, debilitated, and have developed a neuromuscular phenomenon" that impairs swallowing.  Dr. Weiss noted that the "main risk factors for that really are advancing age, altered mental status or dementia, and malnutrition or generalized weakness."  Dr. Weiss opines that Mr. Batistoni's dysphagia is most likely an insidious consequence of general debilitation rather than a specific trauma, including both traumatic intubation and GERD.

## V.

Mrs. Batistoni, married to Mr. Batistoni for twenty-six years, testified at the behest of the plaintiffs.  Her recollection of events differs materially and often irreconcilably from the recollection of other witnesses and from the medical record compiled by doctors, nurses, physicians assistants, and others.  For example, Mrs. Batistoni claims emphatically that Mr. Batistoni uttered – quite literally – not a single word (because, she claims, he was unable to do so) from his August 20 surgery until the Labor Day weekend.  Mrs. Batistoni denies that Mr. Batistoni consumed food – "not one drop of liquid or food went in his mouth" – between August 20, 2007, and the summer of 2008

(because, she claims, he was unable to do so).  Mrs. Batistoni denies that she

confirmed after the surgery that Mr. Batistoni had experienced some swallowing

difficulty and confusion before the surgery.  These claims stand alone athwart the

observations of an array of medical personnel and athwart the whole of the reports

appearing in the medical record.  Because the grossly disproportionate weight of the

evidence gravitates toward the conclusion that Mrs. Batistoni either failed to perceive

correctly, or fails to remember correctly, the pertinent events and, in either case, fails to

report reliably the upsetting and fatiguing events of her husband's surgery and his post-

operative course, her manifestly unreliable testimony forms no part of the resolution of

any disputed matter in this action.

## VI.

The Federal Tort Claims Act invests the United States district court with original

jurisdiction in an action for a tort committed by certain federal entities, including the

Veterans Administration.  Although this action pends in the district court, the substantive

law of Florida governs.  Section 766.102(1), Florida Statutes, prescribes that "the

claimant shall have the burden of proving by the greater weight of evidence that the

alleged actions of the health care provider represented a breach of the prevailing

professional standard of care for that health care provider."  No presumption of

negligence follows the occurrence of a medical injury.  Section 766.102(3), Florida

Statutes, requires that "the claimant must maintain the burden of proving that an injury

was proximately caused by a breach of the prevailing professional standard of care by

the health care provider."  Expert testimony typically establishes the standard of care in

a medical malpractice action.  Pate v. Threlkel, 661 So.2d 278, 281 (Fla. 1995).  In addition to proving that by a preponderance of the evidence the defendant breached the prevailing standard of care, a plaintiff must establish by a preponderance of the evidence that the defendant's breach was a proximate legal cause of the plaintiff's injury.  Gooding v. Univ. Hosp. Bldg., Inc., 445 So.2d 1015, 1018 (Fla. 1984); Abrisch v. United States, 359 F. Supp. 2d 1214, 1229 (M.D. Fla. 2004).

**VII.**

The plaintiffs have failed to establish by preponderant evidence the occurrence of the alleged (or any other) breach of the applicable standard of care in the administration of anesthesia to Mr. Batistoni.  Even assuming a breach, the plaintiffs have failed to establish by preponderant evidence that the breach was a proximate cause of an injury to Mr. Batistoni.

The documentary medical record and the testimony of the pertinent witnesses fail to establish any injury to Mr. Batistoni that resulted from the administration of anesthesia on August 20, 2007.  No lack of oxygenation or other detectable circumstance evidences any act or omission during anesthesia that fell below the standard of care applicable to an anesthesiologist.  Dr. Stirt fails to identity any act or omission by the anesthesiologist or the nurse anesthetist that falls below the standard of care, and the whole of the credible record evidences that none occurred.  The whole of the medical record confirms that Mr. Batistoni's anesthesia was normal and fully in accord with the standard of care.  The prospect that some unspecified injury occurred during intubation or extubation of Mr. Batistoni is a purely speculative hypothesis without substantial and credible supporting evidence in the record.  Dr. Stirt asserts that

only a "profound" injury during intubation would result in dysphagia and Mr. Batistoni's other symptoms.  However, the record contains no evidence of a profound injury, and Dr. Stirt provides no indication of the objective criteria of a "profound" injury.  On the other hand, Dr. Weiss supposes that only an intubation persisting for thirty-six hours and exerting extraordinary force could cause the injury that Dr. Stirt supposes.  No evidence of that appears.  Dr. Stirt confirms that, at best, an intubation or similar injury is only one possible cause of Mr. Batistoni's condition and that he cannot exclude others, including a neurological event, in the governing circumstances.  I find unpersuasive and reject Dr. Stirt's testimony (1) that an injury occurred to Mr. Batistoni's throat during, and caused by, negligent intubation for the administration of anesthesia and (2) that, assuming the injury occurred, the injury was a proximate cause of Mr. Batistoni's dysphagia, aspiration pneumonia, and other symptoms.  I respectfully reject Dr. Stirt's testimony, and in retrospect, I doubt that Dr. Stirt's testimony was sufficient to present a prima facie case of medical malpractice.

The United States offered two experts, Dr. Minkowitz, who is an anesthesiologist, and Dr. Weiss, who is a gastroenterologist.  Each challenges Dr. Stirt's opinions.  In sum, each concludes that no malpractice occurred, that no injury occurred during administration of the anesthesia, and that other factors account for Mr. Batistoni's dysphagia and other symptoms.  I accept that testimony, which accords with the preponderant evidence.

As summarized earlier, Dr. Minkowitz attributed the post-operative swallowing and other problems encountered by Mr. Batistoni to a generalized neuromuscular weakening of the swallowing and esophageal mechanism, aggravated by GERD,

unmasked by the stress of surgery on a patient of Mr. Batistoni's age, and progressing during the perioperative period.  Dr. Weiss agrees and regards the most likely cause of Mr. Batistoni's symptoms as an insidious consequence of general debilitation rather than a specific trauma – some patients "are just older, debilitated, and have developed a neuromuscular phenomenon" that impairs swallowing.  In the facts of this case, the explanation of Drs. Minkowitz and Weiss is distinctly more probable than the explanation of Dr. Stirt.

Ascertaining the cause of Mr. Batistoni's condition is outside the scope of this inquiry, which is limited to determining whether the plaintiffs proved by preponderant evidence that an act of medical malpractice during the administration of anesthesia proximately caused an injury to Mr. Batistoni – and that the plaintiffs have failed to do. The preponderant evidence supports the conclusion that whatever caused Mr. Batistoni's dysphagia, aspiration pneumonia, and the like occurred after the August 20 surgery and was not caused by the August 20 intubation and anesthesia, which was skillfully and uneventfully performed.

### Conclusion

The Clerk is directed to enter a judgment for the defendant and against the plaintiffs on both counts of the complaint and to close the case.

ORDERED in Tampa, Florida, on February 17, 2011.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE